UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MERCURY INDEMNITY COMPANY OF AMERICA,

       Plaintiff,

       v.

GREAT NORTHERN INSURANCE COMPANY, *et al.*,

       Defendants.

Civil Action No. 19-14278 (MAS)(LHG)

OPINION AND ORDER DENYING
<u>MOTION TO QUASH</u>

## I.    INTRODUCTION

This matter comes before the Court by way of a Motion to Quash (the "Motion to Quash") filed by Plaintiff, Mercury Indemnity Company of America ("Mercury"), in response to a subpoena served by Defendant, Great Northern Insurance Company ("Great Northern"). [Docket Entry No. 42]. Mercury filed a Memorandum of Law in Support of its Motion to Quash (the "Memorandum in Support"). [Docket Entry No. 42-1]. Great Northern then filed a Memorandum of Law in Opposition to the Motion to Quash (the "Brief in Opposition"). [Docket Entry No. 43]. Defendant Richards Associates ("Richards") also filed a Memorandum in Opposition adopting Great Northern's position. [Docket Entry No. 44]. Mercury then filed a Memorandum in Further Support of the Motion to Quash (the "Reply"). [Docket Entry No. 49]. Great Northern countered with its Response in Opposition (the "Sur-Reply"). [Docket Entry No. 54]. Mercury filed a further Reply to Great Northern's Response to the Motion to Quash (the "Sur-Sur-Reply"). [Docket Entry No. 60].

On October 20, 2021, the Court held oral argument on the Motion to Quash.  [Docket Entry No. 63].  Mercury and Great Northern then filed supplemental briefing to address questions raised by the Court.  [Docket Entry No. 65] ("Mercury Supplemental"); [Docket Entry No. 66] ("GN Supplemental").

For the reasons set forth below, the Motion to Quash is DENIED.

## II.    BACKGROUND

### A.  The Underlying Suit

This action stems from an underlying personal injury suit, *Mongiello v. Gallagher*.  *See generally,* Complaint [Docket Entry No. 1].  The defendant in that case, Gabrielle Gallagher ("Gallagher"), was a Mercury policyholder who was driving her insured vehicle when she collided with a vehicle in which Mongiello was a passenger, causing injuries.  Complaint ¶¶12, 17.  Gallagher tendered her defense to Mercury, and Mercury appointed the Law Offices of David Harper ("Harper Law Offices"), as Gallagher's defense counsel.  Declaration of David L. Satine, Esq., in Support of the Motion to Quash [Docket Entry No. 42-2] ("Satine Decl."), ¶3, Ex. B.  Chris W. Kemprowski, Esq. ("Kemprowski") of the Harper Law Offices represented Gallagher in the *Mongiello* matter.  Satine Decl., ¶3, Ex. B.

Before trial, the plaintiff served an offer of judgment for $150,000, which was well-within the Mercury policy limit of $250,000.  Complaint ¶11; Certification of Timothy M. Jabbour, Esq., in Support of Defendant's Opposition to Plaintiff's Motion to Quash [Docket Entry No. 43-1] ("Jabbour Cert.") ¶9, Ex. H (Mongiello offer of judgment for $150,000).  Although Gallagher urged Mercury to settle, Mercury rejected the offer.  Jabbour Cert., ¶13, Ex. L at 99:22–102:11 (Gallagher deposition testimony that she told Kemprowski numerous times

that she wanted to settle the case). Even after Mercury received a *Rova Farms* letter[1] from Mongiello's counsel warning of the possibility of an excess verdict, Mercury took the case to trial. Jabbour Cert., ¶10, Ex. I. At trial, the jury found in favor of Mongiello and the judge ultimately entered a verdict of $2,041,326.50 against Gallagher. Complaint ¶¶24–25.

At some point after the verdict was entered, Gallagher retained Anthony Ambrosio ("Ambrosio") as personal counsel. *See* Satine Decl., ¶4, Ex. C; Jabbour Cert., ¶13, Ex. L at 7:8–7:9; Supplemental Declaration of David I. Satine, Esq., in Support of Mercury's Reply [Docket Entry No. 49-1] ("Supp. Satine Decl."), ¶4, Ex. C at 138:2–138:16.

### B. Great Northern's Investigation

Mercury alleges that after the verdict was entered, Gallagher's parents informed Kemprowski, Mercury, and Gallagher for the first time that the Gallaghers had an umbrella policy with Great Northern that provided up to $2,000,000 in coverage. Complaint ¶¶20–22. Mercury maintains that it had no prior knowledge of the umbrella policy; it notified Great Northern the next day and demanded that Great Northern provide coverage for the judgment. Complaint ¶23. Great Northern contends that it was unaware of the *Mongiello* action until it received the notice and demand from Mercury. Jabbour Cert., ¶6, Ex. E.

Upon receiving notice, Great Northern began an investigation to determine whether it was in fact obligated to provide coverage. Satine Decl., ¶4, Ex C. Great Northern notified Gallagher that it was reserving its right to disclaim coverage pending completion of the investigation. Satine Decl., ¶4, Ex. C; Jabbour Cert., ¶6, Ex. E.

---

[1] The *Rova Farms* doctrine states that where an insurer has the opportunity to settle within the policy limits of its insured and does not, the insurer may be liable if a judgment is entered for greater than the policy limit. *See Rova Farms Resort v. Investors Ins. Co.*, 65 N.J. 474 (1974).

As part of its investigation, Great Northern sought documents from Mercury regarding its handling of the *Mongiello* suit.  Jabbour Cert., ¶¶3, 5, Exs. B, D; Satine Decl., ¶¶5, 9, Exs. D, H. Mercury responded by producing some documents but withholding others under a claim of attorney-client privilege and work product.  Satine Decl., ¶¶6–9, 11–13, Exhs. E, F, G, I, J.

At one point during Great Northern's investigation, Gallagher requested that all communications regarding the *Mongiello* litigation and the investigation go through her mother, Loretta Gallagher.  Jabbour Cert., ¶13, Ex. L. at 143:10–144:7.  Loretta Gallagher reached out to Kemprowski and instructed him to provide Great Northern with whatever information they had requested, noting that the request had been made more than a week before and that they had previously given approval for the file to be provided.  Jabbour Cert., ¶¶7, 18, Exs. F, Q.

Subsequently, a Mercury claims director emailed a Great Northern claims representative, advising that she was gathering and sending certain requested documents, including Gallagher's policy with Mercury, court transcripts, and similar materials regarding the *Mongiello* action. Jabbour Cert., ¶19, Ex. R.

### C.  Settlement Discussions and Affirmation of the Verdict

In March 2019, Mercury and Great Northern began discussing a possible settlement. Jabbour Cert., ¶16, Ex. O; Supp. Satine Decl., ¶¶2–3, Exs. A, B.  As part of the negotiations, on or about April 3, 2019, Mercury provided certain documents to Great Northern, including pre- and post-verdict communications between Mercury and the Harper Law Offices regarding the *Mongiello* suit.  Jabbour Cert., ¶¶14, 16–17, Exs. M, O, P.  These included Kemprowski's initial, pre-verdict analysis of the *Mongiello* action, recommendations, strategy, factual summaries, and status updates.  Jabbour Cert., ¶17, Ex. P.  The cover letter accompanying these disclosures stated "CONFIDENTIAL SETTLEMENT COMMUNICATION" and "INADMISSIBLE FOR

ANY PURPOSE." Jabbour Cert., ¶16, Ex. O. The letter set forth a recitation of the facts underlying Mercury's decisions regarding settlement of the *Mongiello* action, and why it believed Great Northern's bad faith allegations were unsupported. Jabbour Cert., ¶16, Ex. O. at 2. Mercury also advised that, in light of these facts, "Defense Counsel will testify that he fully expected a favorable defense verdict." Jabbour Cert., ¶16, Ex. O at 6. Despite their efforts, they were unable to settle the coverage dispute.

Ultimately, the court affirmed the *Mongiello* judgment and denied the appeal. Complaint ¶¶30–32. Gallagher and her parents assigned any rights and claims against Great Northern to Mercury, which satisfied the entire judgment. Complaint ¶¶34–35. Gallagher testified at her deposition that she had destroyed all documents in her possession relating to the *Mongiello* litigation. Jabbour Cert., ¶13, Ex. L. at 124:15–128:17.

### D.  The Instant Action

On June 26, 2019, Mercury initiated the instant action against Great Northern,[2] demanding that it satisfy the portion of the judgment exceeding Gallagher's policy limit with Mercury and any deductible.[3] *See generally* Complaint. Mercury asserts, *inter alia,* that Great Northern denied coverage in bad faith; in its Answer, Great Northern denies the allegations and asserts as a defense Mercury's bad faith in refusing to settle within the policy limits in *Mongiello*. *See, e.g.,* Complaint at ¶¶52–62; [Docket Entry No. 24]; Supp. Satine Decl., ¶3, Ex. B; Jabbour Cert., ¶11, Ex, J.

---

[2]  Mercury also sued Richards, the Gallaghers' insurance broker, due to an alleged gap in coverage between the Mercury and Great Northern policies. Satine Decl., ¶2, Ex. A; Jabbour Cert., ¶2, Ex. A. That claim is not at issue in the present Motion to Quash.

[3]  Mercury's Complaint alleges breach of contract, breach of the implied covenant of good faith and fair dealing, contribution, subrogation, negligence, and breach of fiduciary duty. *See generally* Complaint.

During discovery, Mercury requested that Great Northern produce documents regarding Great Northern's assertions that Mercury acted in bad faith in its handling of the *Mongiello* action.  Jabbour Cert., ¶11, Ex. J. at ¶¶16–20, 22.  Great Northern in turn sought production from Mercury of all relevant documents and communications concerning the *Mongiello* action from Harper Law Offices (the "Harper File").  Brief in Opposition at 9.

Mercury disclosed what it deemed responsive, non-privileged materials but withheld significant portions of the Harper File.  Satine Decl., ¶¶10–11, Exs. H, I.  For example, Mercury limited its initial production to documents such as claims notes setting out its analysis of and decisions made with respect to the *Mongiello* action.  Satine Decl., ¶ 8.  Mercury produced a 7-page privilege log, asserting attorney-client privilege and work product protections as to various pre- and post-verdict documents.  [Docket Entry No. 54-2].

After Great Northern was unable to obtain what it was seeking from Mercury, it served a subpoena directly on the Harper Law Offices on or about January 21, 2021.  Satine Decl., ¶14, Ex. K.  The subpoena sought production of the Harper File, including all documents relating to the office's conduct in the *Mongiello* action not previously produced by Mercury.  Satine Decl., ¶14, Ex. K.  Mercury and the Harper Law Offices objected to the subpoena as overly broad and unreasonable.  Satine Decl., ¶15, Ex. L.  The Harper Law Offices then produced a 32-page privilege log (the "Harper Privilege Log").  [Docket Entry No. 54-1].  The entries generally include pre- and post-verdict documents and communications related to motion practice, jury instructions, settlement, trial preparation, discovery, investigations of plaintiff, medical records, expert reports, post-trial reports, and appeals.  They also include attorney research, notes, impressions, and strategy.  *Id.*

Mercury filed the present Motion to Quash, noting that it had obtained Gallagher's authorization to file the motion on her behalf. Reply at 9. Great Northern requested that Mercury withdraw its motion, or alternatively, that Mercury pay for the costs and fees associated with the instant motion. Jabbour Cert., ¶15, Ex. N.

## III.    ARGUMENTS OF THE PARTIES

### A.  Mercury's Brief in Support of the Motion to Quash

In seeking to quash the subpoena, Mercury asserts that the attorney-client privilege and work product protections apply. Memorandum in Support at 12–15. Mercury argues that there was an attorney-client relationship among Mercury, Gallagher, and Kemprowski, given that Kemprowski served as Mercury and Gallagher's legal counsel in the underlying suit. *Id.* at 12–13. According to Mercury, the Harper File includes communications among them regarding the suit; those communications are therefore privileged. *Id.* at 13–14.

Mercury also maintains that work product protections apply because the Harper File includes Kemprowski's notes about motions, depositions, and oral arguments in the *Mongiello* action. *Id*. at 14–15. Mercury says these notes include Kemprowski's mental impressions, potential responses, research, and other similar work product. *Id.* at 15. These files, Mercury argues, must be protected because Great Northern does not have a substantial need for them, nor will Great Northern be unduly burdened without them. *Id.*

Mercury rebuts Great Northern's argument that there is a common interest between them, arguing that Great Northern has not established the two necessary requirements for finding common interest in the insured/insurer context. *Id.* at 19. First, an insurer must have either defended the insured or acknowledged an obligation to defend the underlying action on behalf of the insured; Mercury argues that Great Northern has done neither. *Id.* at 17, 19. Second, the

insurer must have employed a lawyer to act on behalf of itself and the policyholder jointly; Great Northern did not do so here. *Id.* There was no joint defense between Gallagher and Great Northern, and Great Northern was not part of the triadic relationship between Mercury, Kemprowski, and Gallagher. *Id.* at 19. Mercury asserts that the parties are also adverse on key issues, so there is no common interest. *Id.*

Mercury also rejects the notion that it has put the Harper File at issue, given that it has not asserted a claim or defense that it intends to prove by utilizing privileged communications. *Id.* at 20–22. Mercury therefore argues that Great Northern cannot meet the test set out by the Court in *In re Kozlov*, 79 N.J. 232 (1979) for piercing the attorney-client privilege. Memorandum in Support at 21–23.

Pursuant to the *Kozlov* test, the party seeking production must first show a legitimate need for the materials; Mercury argues that Great Northern lacks such a need, as there are no constitutional rights at stake and there has been no waiver. *Id.* at 21. Second, the materials sought must be relevant and material to the issues being litigated. Mercury argues that a key inquiry for this prong is whether the holder of the privilege seeks to inject the privileged material into the litigation as part of its claim. *Id.* at 22. The Harper File is neither relevant nor material to Mercury's claims or defenses. Although it may be marginally relevant to Great Northern's defenses, that is insufficient to put it in issue. *Id.* In addition, Mercury asserts that Great Northern cannot meet the third prong because other sources for the information exist, such as the claims notes it previously disclosed and Mercury witnesses who will be deposed. *Id.* at 23. Accordingly, Mercury contends that the Harper File is not in issue. *Id.* at 24.

**B.  Great Northern's Brief in Opposition**

Although Great Northern does not expressly concede that any privileges or protections apply, its arguments focus on piercing any purported privilege.  Brief in Opposition at 1–3. Great Northern asserts numerous bases for piercing the privilege: waiver, common interest, the "in issue" doctrine, and public policy considerations.  *Id.* at 1–3, 11–26.

Great Northern contends that Mercury's production to Great Northern of Kemprowski's work product as well as communications between the Harper Law Offices and Mercury constitutes a waiver of any privilege or protection.  *Id.* at 14–15.  This production was voluntary and selective, and included both attorney-client communications and Kemprowski's work product.  *Id.*  Great Northern argues that the disclosed documents relate to the same subject matter as the rest of the Harper File.  *Id.* at 14.  Because Mercury may not produce some privileged information while shielding the rest, the entirety of the Harper File must be produced. *Id.* at 15.

Great Northern maintains that there has also been express waiver of the privilege both by Gallagher, through her mother, and by Mercury, through its claims director.  *Id.* at 15–16. Mercury asserts that Loretta Gallagher, speaking on behalf of her daughter, directed Kemprowski to comply with Great Northern's requests for documents.  *Id.* at 15.  Great Northern also argues that the Mercury claims director waived the privilege when she promised to send the documents Great Northern sought, including litigation reports prepared by counsel.  *Id.* at 15–16.

Next, Great Northern contends that a common interest exists between Mercury and Great Northern, such that Mercury may not assert privilege over the materials related to that common interest.  *Id.* at 23–24.  Great Northern argues that this Court should apply the reasoning of *Allied World Assur. Co (U.S.), Inc. v. Lincoln General Ins. Co.*, 280 F.R.D. 197 (M.D. Pa. 2012), in

which the court held that a primary carrier owes an excess carrier a fiduciary duty, such that the excess carrier is entitled to privileged communications between the primary carrier and their counsel in a bad faith suit filed against the excess carrier.  Brief in Opposition at 24.

Great Northern argues that there was no adversarial relationship between Mercury, Gallagher, and Great Northern at the time Mercury rejected the proposed settlement in *Mongiello* because Great Northern was not aware of the action, nor was Mercury aware of the Great Northern policy.  *Id.* at 24–25.  Based on these facts, the two cases relied upon by Mercury are distinguishable.  First, unlike in *NL Indus, Inc. v. Commercial Union Insurance Company,* 144 F.R.D. 225, 231 (D.N.J. 1992), a common interest should be found here, given that Harper Law Offices was acting on behalf of Mercury, Gallagher, and Great Northern "by extension."  Brief in Opposition at 25.  Similarly, *Pittston Co. v. Allianz Insurance Co.,* 143 F.R.D. 66 (D.N.J. 1992), does not foreclose the finding of a common interest where, as here, the insurer did not have notice or an opportunity to participate in the underlying action.  Brief in Opposition at 25–26.

Additionally, Great Northern asserts that Mercury has placed its conduct in the underlying *Mongiello* action and its decision not to settle in issue in this case.  *Id.* at 17. Applying the *Kozlov* test, Great Northern argues that the first prong is satisfied because Mercury itself injected privileged materials into the litigation by seeking discovery on Great Northern's determination that Mercury acted in bad faith.  *Id.*  The first factor is also satisfied because Mercury has waived the privilege.  *Id.* at 18.  As to the second prong, Great Northern maintains that the Harper File is the sole source of information on Mercury's handling of the *Mongiello* suit, the central issue in this case, and is clearly relevant and material.  *Id.* at 19.  Great Northern rejects Mercury's assertion that relevance is determined solely by its asserted claims and defenses, particularly when Mercury itself has sought discovery on the same issues.  *Id.* at 19–

20.  Finally, Great Northern argues that it meets the third prong of *Kozlov* because there are no other sources from which to obtain the subpoenaed materials: Mercury refused to produce them, whereas Gallagher destroyed her file and had little recollection of relevant communications with Mercury or Kemprowski.  *Id.* at 20–21.  Thus, the Harper File is in issue.  *Id.* at 16–21.

Great Northern also asks this Court to consider the public policy issues at play here and argues that Mercury owes Great Northern a fiduciary duty as well as a duty to act in good faith. *Id.* at 22 (relying on *United Jersey Bank v. Wolosoff*, 196 N.J. Super. 553 (App. Div. 1984)) (finding that overriding public policy concerns may require privileged materials to be produced). Great Northern further asserts that Mercury is acting "under a shroud of secrecy" in failing to identify all of the documents it is withholding on its privilege logs.  *Id.* at 21–22.

### C.  Mercury's Reply

On reply, Mercury maintains that because its own discovery requests do not pertain to Mercury's claims or defenses, it has not injected privileged information into the litigation so it cannot be in issue.  Reply at 9–11.  Mercury then addresses for the first time the issue of waiver, refuting Great Northern's arguments without responding directly to the public policy or fiduciary duty arguments.  *Id.* at 3–9.

Mercury argues that its production of certain documents from the Harper File did not constitute a selective waiver because it was in the settlement context and the documents were marked "INADMISSIBLE FOR ANY PURPOSE" as "CONFIDENTIAL SETTLEMENT COMMUNICATION."  *Id.* at 3–4.  Further, Mercury asserts that it is not relying on the disclosed privileged information to support its position.  *Id.* at 5.

Mercury denies that the statements made by Loretta Gallagher and Mercury's claims director equate to an express waiver of the privilege.  *Id.* at 7–9.  The claims representative did

not refer to attorney-client communications. *Id.* at 5–6. Loretta Gallagher had no legal authorization to waive the privilege on behalf of her adult daughter and testified in her deposition that her statements to Great Northern were not meant to constitute a waiver. *Id.* at 2, 7–8.

### D. Great Northern's Sur-Reply

Great Northern repeats its arguments regarding common interest and waiver. Sur-Reply at 1–5. It argues that the Harper File is in issue because there is no evidence that Mercury ever notified Gallagher of the *Rova Farms* demand letter Mercury received or the possibility of an excess verdict. *Id.* at 6–7.

Great Northern then argues for the first time that Mercury has made purposeful efforts to conceal information and that Mercury is engaging in gamesmanship. *Id.* at 1–2. Great Northern points out that Mercury intentionally failed to identify a substantial number of purportedly privileged documents, as evidenced by a significantly lengthier second privilege log, produced a few days prior to Great Northern's filing of its Sur-Reply. *Id.* at 2.

Great Northern further maintains that Mercury is attempting to use the privilege as both a sword and a shield by only disclosing information that favors its own position while shielding any unfavorable materials under a claim of privilege. *Id.* at 4.

Next, Great Northern posits that the communications on the Harper Privilege Log involving Ambrosio, Gallagher's personal counsel, cannot be privileged because Mercury did not have an attorney-client relationship with Ambrosio; in fact that relationship was adverse given that the Gallaghers did not retain Ambrosio until after the adverse jury verdict. *Id.* at 5. Thus, Great Northern says those communications should also be produced. *Id.*

### E.  Mercury's Sur-Sur-Reply

Mercury reiterates that the in issue doctrine does not apply here because Mercury is not relying on privileged communications to prove its claims.  Sur-Sur-Reply at 3.  As to the communications with Ambrosio, Mercury disputes that there was an adverse relationship at the time the communications at issue were made.  *Id.* at 4.

Finally, Mercury denies that it has purposefully withheld or failed to log documents, noting it was unable to locate all of its privileged communications with Kemprowski when the first log was produced more than a year after this suit was initiated.  *Id.* at 1–2.  It then voluntarily conducted ESI searches to locate the communications. The search continues, and Mercury represents in its Sur-Sur-Reply that another privilege log will be forthcoming.[4]  *Id.* at 2.

### F.  The Parties' Supplemental Briefs

In its supplemental brief, Mercury further addresses the common interest and at issue doctrines.  As to common interest, Mercury reiterates that Great Northern did not have an attorney-client relationship with Kemprowski, did not pay towards Gallagher's defense or have any control over the legal strategy, and did not share the same interest because it did not accept coverage for the judgment.   Mercury Supplemental at 5–6.  Mercury also asserts that Great Northern's reliance on *Allied* is misplaced, *inter alia*, because the existence of a fiduciary duty between Mercury and Gallagher was "unclear" given that Great Northern never subrogated to Gallagher's rights by paying the judgment or obtaining an assignment.  *Id.*  at 10.  Mercury also argues that there can be no waiver without the consent of both Mercury and Gallagher, given their status as joint clients and given that the communications at issue relate to their joint

---

[4] The parties did not further update the Court as to any additional logs or productions, and the Court makes its rulings based upon the record as presented.

representation; since both did not jointly agree to waive the attorney-client privilege, Great Northern's waiver argument fails.  *Id.* at 2–4.

In its supplemental briefing, Great Northern also revisits its previous arguments for finding that the Motion to Quash should be denied, including waiver, at issue, and common interest doctrine.  It asserts that a common interest exists here in light of the duty of good faith and fair dealing Mercury owed Great Northern as the primary insurer, and the lack of adversarial relationship between the carriers during the underlying litigation.   GN Supplemental at 4–6.

## IV.    LEGAL STANDARD

### A.  Motions to Quash

Rule 26 of the Federal Rules of Civil Procedure governs the scope of discovery. Subsection (b)(1) states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  While the scope of discovery is broadly construed, it is not without its limits and may be circumscribed.  *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999).

Discovery sought via subpoena must fall within the scope of discovery permissible under Rule 26(b).  *See* Fed. R. Civ. P. 45(d)(3); *Duardo v. City of Hackensack,* Civ. No. 17-2308, 2021 WL 3508781, *2 (D.N.J. Aug. 9, 2021).  In particular, the court may quash a subpoena that seeks disclosure of privileged or protected materials, unless an exception or waiver applies.  Fed. R. Civ. P. 45(d)(3)(A)(iii).

Where a case is grounded in diversity jurisdiction, the applicability and scope of the attorney-client privilege is based on state law.  *See* Fed. R. Evid. 501; *In re Human Tissue Prods. Liab. Litig.,* 255 F.R.D. 151, 156 (D.N.J. 2008); *Maertin v. Armstrong World Indus., Inc.,* 172 F.R.D. 143, 147 (D.N.J. 1997) ("In cases where a district court is exercising diversity jurisdiction,

the law of privilege which controls is that which would be applied by the courts of the state in which it sits.").  Federal law, however, governs the work product doctrine even in diversity cases. *Maertin, supra,* 172 F.R.D. at 147 ("[u]nlike the attorney-client privilege, the work product privilege is governed, even in diversity cases, by uniform federal law embodied in Rule 26(b)(3)").

### B.  The Attorney-Client Privilege

New Jersey's attorney-client privilege, codified at N.J.S.A. 2A:84A-20, protects "confidential communications between an attorney and his client made in a professional confidence in the course of their legal relationship"; the client possesses the privilege to refuse disclosure of communications made in confidence and to prevent others from doing so.  *Haines v. Liggett Grp., Inc.,* Civ. No. 84-678, 2000 U.S. Dist. LEXIS 22491, *14–15 (D.N.J. Sept. 11, 2000). The privilege, however, will not apply where a communication is "knowingly made within the hearing of any person whose presence nullifies the privilege"; communications with third parties whose presence is necessary for the representation are, however, encompassed within the privilege. *O'Boyle v. Borough of Longport*, 218 N.J. 168, 185 (2014).  Thus, the privilege generally applies to communications (1) in which legal advice is received or sought by a client, (2) from an attorney acting in his capacity as a legal advisor, (3) and the communication is made with the expectation of confidentiality.  *Hedden v. Kean Univ.*, 434 N.J. Super. 1, 10 (App. Div. 2013); *see Stengart v. Loving Care Agency,* 201 N.J. 300, 315 (2010).

The attorney-client privilege serves to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Koch Materials Co. v. Shore Slurry Seal, Inc.,* 208 F.R.D. 109, 117 (D.N.J. 2002) (quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981)).  The privilege is deeply embedded in the law and is a reflection of the principle that sound legal advice serves the

public and encourages truthful communication between attorneys and their clients.  *See United Jersey Bank*, *supra,* 196 N.J. Super at 561.  Thus, if applicable, the privilege must be given "as broad a scope as its rationale requires."  *Id.*  Nevertheless, given that the privilege results in the suppression of evidence, it must "be strictly limited to the purposes for which it exists."  *Hedden, supra,* 434 N.J. Super. at 12; *Koch Materials Co., supra,* 208 F.R.D. at 117.  The party asserting the privilege bears the burden to show that it applies.  *Hedden, supra,* 434 N.J. Super. at 12.

Under New Jersey law, the holder of a privilege waives that privilege if he or she "without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone."  N.J.R.E. 530(a); *see Haines, supra,* 2000 U.S. Dist. LEXIS 22491, at *15.  Additionally, subject matter waivers may be appropriate when fairness requires such disclosure.  *See* N.J.R.E. 530(c)(1); Fed. R. Civ. P. 502(a); *In re Grand Jury Subpoena Issued to Galasso*, 389 N.J. Super. 281, 298 (App. Div. 2006); *Sicpa North America, Inc. v. Donaldson Enterprises, Inc.,* 179 N.J. Super. 56, 62 (Law Div. 1981).

### C.  Work Product Protections

Federal Rule of Civil Procedure 26(b)(3) provides that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  *See also Westinghouse Elec. Corp. v. Republic of Philippines,* 951 F.2d 1414, 1428 (3d Cir. 1991); *In re Human Tissue Prods., supra,* 255 F.R.D. at 157.  Work product is defined as materials an attorney prepares in anticipation of litigation, including mental impressions of the case and the parties, legal theories, opinions, conclusions, litigation strategy, and other similar materials.  Fed. R. Civ. P. 26(b)(3)(B); Fed. R. Evid. 502(g)(2).

Courts use a two-part test to determine whether the materials in dispute should be protected under the work product doctrine. *Louisiana Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 306 (D.N.J. 2008). First, courts consider whether the document was prepared in anticipation of litigation. *Id.*; *Symetra Life Ins. Co. v. JJK 2016 Ins. Tr.*, Civ. No. 18-12350, 2019 WL 4931231, *6 (D.N.J. Oct. 7, 2019) (court evaluates "whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."). Next, courts look at whether the documents were prepared for the primary purpose of litigation. *Louisiana Mun. Police Emps. Ret. Sys.*, *supra,* 253 F.R.D. at 306–07. If the materials were not prepared for the primary purpose of anticipated or actual litigation, in other words if they were prepared in the ordinary course of business, they are not protected work product. *Id.*

Exceptions may apply to the protection afforded to work product. Fed. R. Civ. P. 26(b)(3)(A); Fed. R. Evid. 502(g)(2). Specifically, non-opinion work product materials may be discovered if "(i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i)-(ii). A substantial need exists where the information would have a significant impact on the outcome of the case. *See Jenkins v. Rainner*, 69 N.J. 50, 58 (1976).

### D. Common Interest Doctrine

The common interest doctrine does not create a new basis for privilege; rather, it permits an individual or entity to disclose privileged material, including both attorney-client communications and work product, to third parties without waiving any privilege. *O'Boyle*, *supra,* 218 N.J. at 197 (discussing the application of the common interest doctrine in the context of the

attorney-client privilege and work product doctrine); *LaPorta v. Gloucester Cnty. Bd. of Chosen Freeholders,* 340 N.J. Super. 254, 262 (App. Div. 2001) (finding no waiver of privilege from the sharing of attorney work product because of the applicability of the common interest doctrine); *Margulis v. Hertz Corp.,* Civ. No. 14-1209, 2019 WL 2406344, *2 (D.N.J. Feb. 19, 2019).  The doctrine protects communications between counsel for different parties as long as the disclosure is made due to actual or anticipated litigation, for the purposes of furthering a common interest, and the manner of disclosure is not "inconsistent with maintaining confidentiality against adverse parties." *Travelers Prop. Cas. Co. of Am. v. USA Container Co. Inc.,* Civ. No. 09-1612, 2012 WL 12898823, *22 (D.N.J. Oct. 25, 2012) (quoting *LaPorta, supra,* 340 N.J. Super. at 262), report and recommendation adopted, 2012 WL 12903853 (D.N.J. Nov. 28, 2012); *O'Boyle, supra,* 218 N.J. at 198–199.

In New Jersey, courts interpret the doctrine very broadly.  *Margulis, supra,* 2019 WL 2406344, at *3; *O'Boyle, supra,* 218 N.J. at 199.  The parties need not have identical interests for the privilege to apply; a common purpose is sufficient.  *O'Boyle, supra,* 218 N.J. at 199; *Travelers Prop., supra,* 2012 WL 12898823, at *22 (noting that "persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute and defend their claims").  Additionally, whether or not the parties share a common interest or purpose "must be evaluated as of the time that the confidential information is disclosed." *Travelers Prop., supra,* 2012 WL 12898823, at *22.

## I.    ANALYSIS

The Court is called upon to consider whether the information Great Northern seeks is protected pursuant to the attorney-client privilege or the work product doctrine.  If it is, the Court will quash the subpoena, unless any exceptions apply that allow Great Northern to pierce the

privilege or protections.  The first issue the Court considers is whether the attorney-client

privilege or work product doctrine protects the Harper File.

### A.  Attorney-Client Privilege and Work Product Doctrine

The attorney-client privilege, broadly speaking, applies to communications between an

attorney and client for the provision of legal advice, and where the communication is not made in

the presence of a third-party that may destroy the privilege.  *See* N.J.S.A. 2A:84A-20; N.J.R.E.

504(3); *O'Boyle*, *supra,* 218 N.J. at 185–186.

Here, Great Northern asserts without support that Mercury is not entitled to assert the

privilege on behalf of Gallagher.  Brief in Opposition at 15.  In response, Mercury notes that it

obtained Gallagher's authorization to file the present Motion on her behalf.  Reply at 9.  Given

Mercury's role and involvement in the defense of the underlying litigation, as well as

Gallagher's assignment to Mercury, the Court finds that Mercury has standing to assert the

privilege as to the files at issue.

Next the Court considers whether the privilege applies to the Harper File.  Mercury has

the burden in this regard and argues that the privilege applies to communications between

Kemprowski and Gallagher because Kemprowski represented Gallagher in the *Mongiello* suit;

the communications concern legal matters regarding the *Mongiello* action; and the

communications were not shared with third-parties.  Memorandum in Support at 12–13.

Mercury also asserts that the attorney-client relationship extended not only to Gallagher but also

to Mercury, given its role as insurer.  *Id.* at 13–14.  This is consistent with case law holding that

in the triadic relationship between the insurer, insured, and insurance counsel, the "insurance

defense counsel routinely and necessarily represents two clients: the insurer and the insured."

*Lieberman v. Emp.'s Ins. Of Wausau,* 84 N.J. 325, 338 (1980).  The Harper file contains

communications among Gallagher, Kemprowski, and Mercury concerning all aspects of the *Mongiello* litigation, including discovery, settlement, and trial preparation. *See generally* Harper Privilege Log. Great Northern does not challenge the applicability of the privilege to the file, and the Court finds Mercury has satisfied its burden to establish that the attorney-client privilege applies to the communications at issue among Gallagher, the Harper Law Offices, and Mercury.

Finally, the Court turns to communications in the Harper File that include Ambrosio. The parties do not argue, and this Court does not find, that the communications including Ambrosio fall within the attorney-client privilege. The Gallaghers retained Ambrosio as their personal counsel after the adverse verdict, presumably to advise them as to their own rights and obligation. He is not part of the triadic relationship referred to above. While Mercury hints that there is a common interest with Ambrosio, this Court finds that Mercury has not met its burden of showing that there was no adversity by the time Ambrosio was retained. Without such a showing, the presence of Ambrosio in communications defeats any privilege that might otherwise apply. The Court therefore orders that any communications including Ambrosio which are in the possession of the Harper Law Offices and withheld on the basis of attorney-client privilege must be produced.

Next, the Court turns to whether the communications at issue are protected as work product. Materials prepared in anticipation of litigation and for the primary purpose of litigation, including strategy, mental impressions or opinions, and legal theories, are protected from disclosure. Fed. R. Civ. P. 26(b)(3); *Westinghouse Elec. Corp., supra,* 951 F.2d at 1431 n.18.

The parties do not dispute that the Harper File, as the file of the firm handling the *Mongiello* matter, contains work product subject to the work product protection. The Court agrees. It is apparent from the record and briefing that the file contains documents prepared in

anticipation of the *Mongiello* litigation and subsequent appeals and for the primary purpose of such litigation. *See* Satine Decl., at ¶¶18–20; *Louisiana Mun. Police Emps. Ret. Sys., supra,* 253 F.R.D. at 306–07.

### B. Common Interest Doctrine

Having found that the attorney-client privilege and work product doctrine apply, the Court next turns to whether it may nevertheless compel the production of the documents in the Harper File under the common interest doctrine.

Mercury argues that the common interest doctrine does not apply here because Great Northern was not involved in Gallagher's defense, it did not acknowledge an obligation to defend Gallagher, and it did not employ Kemprowski to act on behalf of itself and Gallagher. Memorandum in Support at 17–19; Mercury Supplemental at 4–8. In support, Mercury relies primarily upon cases discussing the common interest doctrine as it applies between a policyholder and its insurer. *See, e.g.,* Memorandum in Support at 16–20; Mercury Supplemental at 4–8; *In re Envtl. Ins. Declaratory Judgment Actions,* 259 N.J. Super. 308 (App. Div. 1992) (no common interest where insurer did not have attorney-client relationship with insured's counsel); *NL Indus., supra,* 144 F.R.D. at 232 (no common interest where insurers denied coverage and insured had to defend its own claims); *Pittston Co., supra,* 143 F.R.D. at 69–71 (D.N.J. 1992) (no common interest where insurer denied coverage, did not defend policyholder, and insured's counsel did not also represent insurer). Mercury does not provide any cases discussing the doctrine in the primary insurer-excess insurer context.

Meanwhile Great Northern argues that the doctrine applies here based on the duty of good faith Mercury, as the primary insurer, owed Great Northern. Great Northern maintains that it shared a commonality of interest with Mercury and Gallagher to defend and minimize

Gallagher's exposure.  GN Supplemental at 4.  The fact that Great Northern did not participate in the *Mongiello* action was not due to an adversarial relationship between those involved, but rather, was solely due to the fact that Great Northern did not receive timely notice.  GN Supplemental at 4–6.  The Court agrees.

The narrow interpretation of the common interest doctrine, as discussed in the cases Mercury cites, makes sense in light of the primary insurer's duties to its policyholder, including its duty to exercise good faith in handling the defense of the claims.  *CNA Ins. Co. v. Selective Ins. Co.*, 354 N.J. Super. 369, 383–384 (App. Div. 2002).  Given the primary insurer's duty to defend on behalf of the insured, it is appropriate for the Court to require the insurer to have acknowledged its obligation to defend and to have paid towards the costs of the defense before it may avail itself of the benefits of the doctrine.  Applying these cases to the facts at hand, however, would ignore the unique relationship and the different obligations between a primary insurer and an excess insurer.

In New Jersey, the primary insurer owes the excess insurer a duty to exercise good faith, "to take the initiative" in handling the claims and to attempt to reach a settlement within the primary insurer's policy limit.  *Baen v. Farmers Mut. Fire Ins. Co. of Salem Cnty.,* 318 N.J. Super. 260, 267 (App. Div. 1999); *Estate of Penn v. Amalgamated Gen. Agencies*, 148 N.J. Super. 419, 424 (App. Div. 1977) (holding that a primary insurer owes an excess insurer "the same positive duty to take the initiative and attempt to negotiate a settlement within its policy limit that it owes to its assured.").  The excess insurer, therefore, generally has no duty to participate in the defense, and instead relies on the primary insurer's good faith handling of the claims.  *CNA Ins., supra,* 354 N.J. Super. at 383–84.

Accordingly, an excess insurer relies on the primary insurer to reasonably (1) discharge its claims-handling obligations; (2) discharge its defense obligations; (3) properly disclose and apprise the excess insurer of events which will likely affect that insurer's coverage; and (4) safeguard the rights and interests of the excess insurer by not placing the primary insurer's own interests above that of the excess insurer. *CNA Ins., supra,* 354 N.J. Super. at 383. The imposition of such a duty of good faith and fair dealing on the primary insurer is based in fairness and policy. *Baen, supra,* 318 N.J. Super. at 267. Specifically,

> [t]he primary is in a knowledgeable position as it has current information of the status of an underlying claim, while the excess carrier relies on the primary carrier to keep it properly apprised of negotiation and litigation. It is a unique relationship between the parties, and it is reasonable for the excess carrier to rely on the primary carrier to act in good faith.

*American Centennial Ins. Co. v. Warner-Lambert Co.,* 293 N.J. Super. 567, 578–579 (Law Div. 1995); *Estate of Penn, supra,* 148 N.J. Super. at 423–24 (noting that when the primary insurer undertakes the representation of the insured, "it has the sole right to negotiate settlements" and therefore "the interests of the excess carrier are very much affected by the actions of the primary").

Within this context, applying Mercury's reasoning leads to an illogical result. A primary insurer would not be able to keep an excess insurer apprised of the underlying litigation without waiving privilege in the process. Since the excess insurer is typically not directly involved in the defense of the underlying litigation, common interest as defined by Mercury would not apply to protect against such a waiver. This makes no sense. The Court also disagrees with Mercury's additional argument that the primary insurer's fiduciary duty to the excess insurer is conditioned upon the excess insurer first contributing towards the final judgment or obtaining an assignment; the duty exists even before any judgment is even reached. *See* Mercury Supplemental at 7.

This Court instead follows the broader approach, that the common interest doctrine protects otherwise privileged communications or work product shared with non-parties as long as the disclosure is made due to actual or anticipated litigation, to further a common interest, and is made in a manner sufficient to preserve the confidentiality of the documents and prevent disclosure to adverse parties.  *See O'Boyle*, *supra,* 218 N.J. at 198–199*; Travelers, supra,* 2012 WL 12898823, at *22.  In *Travelers*, the defendant/insured asserted that the plaintiff/primary insurer, The Travelers Property Casualty Company of America ("Travelers"), had waived the attorney-client privilege by disclosing its opinions and legal analysis regarding the underlying litigation to Chubb, the excess insurer.  *Travelers, supra,* 2012 WL 12898823, at *21.  The court disagreed, finding that there was common interest between the insurers such that there was no waiver.  In so finding, the court noted that the communication between the insurers was to further a common purpose with respect to the coverage dispute.  *Id.* at *21–23.  Additionally, as the excess insurer, Chubb was entitled to know the primary insurer's position on the dispute, and Travelers was legally obligated to keep Chubb apprised of the status of the claim and litigation. *Id*.

Similarly, here, had Great Northern received timely notice of the *Mongiello* action, Mercury, as the primary insurer, would have been obligated to provide Great Northern with the information it now seeks to withhold.  Of particular relevance here, Mercury would have had to keep Great Northern apprised of settlement discussions and strategic decisions.  *See American Centennial Co., supra,* 293 N.J. Super. at 575.  Great Northern was not adverse to the others during the underlying *Mongiello* action, especially where its lack of involvement was not due to it disclaiming coverage or choosing not to be involved.  *See Baen, supra,* 318 N.J. Super. at 267 (once an excess insurer denies coverage, the primary insurer's duty of good faith "evaporates"

and the primary is no longer obligated to keep excess apprised of the status of the claim). Therefore, Mercury would have been able to provide the requested Harper File to Great Northern without waiving any privilege because the disclosure would have been made to a non-adverse entity to further a common interest with respect to the handling of the *Mongiello* action. That Great Northern did not actually receive notice of the *Mongiello* action should not prevent it from obtaining now what it otherwise would have received in the normal course.

The Court is satisfied that this result comports not only with the case law but also with common sense. Mercury is suing Great Northern to recover monies it paid on behalf of their common insured in a case in which Mercury controlled the defense and passed up on an opportunity to settle within its policy limits. To expect reimbursement for the substantial judgment at issue, without disclosing all of the documents that reflect Mercury's reasoning in not settling before trial, would run counter to the public policy behind the relationship between excess and primary insurers. *See, e.g., Travelers, supra,* 2012 WL 12898823, at *21, *23 (describing the common interest doctrine as "commonsensical" and finding the excess carrier was indisputably entitled to know the bases for the primary carrier's position and opinion). This is especially so given that the file is not available to it through any other means. Therefore, the Court finds that the common interest doctrine applies, such that the otherwise privileged documents in the Harper File may be provided to Great Northern without waiving any attorney-client privilege or work product protection. Accordingly, the Court denies the Motion to Quash and orders Mercury to produce the documents previously withheld as privileged or as work product. Because this Court finds that the common interest doctrine applies, it does not reach the in issue doctrine or waiver.

### C.  Attorney's Fees

Great Northern argues that it is entitled to the fees and costs associated with the motion pursuant to Rule 11.  Rule 11, however, only applies where the motion filed was frivolous, unreasonable, or without factual foundation.  Fed. R. Civ. P. 11.  The Court does not find that Mercury's Motion to Quash was frivolous or baseless.  Mercury presented strong arguments as to why the Harper File is privileged and not subject to a subpoena.  That it did not prevail is not a basis for an award of attorney's fees.  *Ario v. Underwriting Members of Syndicate 53 at Lloyds*, 618 F.3d 277, 297 (3d Cir. 2010) (noting that Rule 11 sanctions appropriate only "in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous.").  The Court therefore denies Great Northern's request for an award of the fees and costs associated with opposing the Motion to Quash.

### II.    CONCLUSION

For the foregoing reasons, and for good cause shown,

**IT IS** on this **22nd** day of **March, 2022,**

**ORDERED** that Plaintiff's Motion to Quash [Docket Entry No. 42] is hereby **DENIED** in its entirety; and it is further

**ORDERED** that the Harper Law Offices is to produce the documents withheld as attorney-client privileged or work product in accordance with this Order within 30 days of entry of this Order; and it is further

**ORDERED** that Great Northern's request for an award of the fees and costs associated with opposing the Motion to Quash is **DENIED**; and it is further

**ORDERED** that counsel are to confer as to a schedule for any remaining discovery to be conducted in light of this Order, and provide the Court with a proposed schedule within 14 days of the date hereof.

LOIS H. GOODMAN
United States Magistrate Judge